# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF MISSISSIPPI
# GREENVILLE DIVISION

**THOMAS RUSSELL**                                                                           **PLAINTIFF**

**v.**                                                                     **CASE NO.: 4:22CV165-MPM-JMV**

**ATTALA STEEL INDUSTRIES, LLC;**
**BILLY ATWOOD**                                                        **DEFENDANTS**

## ORDER

This cause comes before the court on the motions of defendants Attala Steel Industries, LLC ("Attala") and Billy Atwood to dismiss, pursuant to Fed. R. Civ. P. 12(b)(6). Plaintiff Thomas Russell has responded in opposition to the motions, and the court, having considered the memoranda and submissions of the parties, is prepared to rule.

This is a case arising out of a business relationship turned sour, in which the plaintiff seeks both to rescind a contract which, he claims, arose out of fraud on the part of defendants and to obtain damages as a result of such fraud. The complaint in this case alleges that, on June 22, 2018, plaintiff contacted Attala's president, Billy Atwood regarding a Steel Post Design ("the Design") for which plaintiff had a pending patent application. [Complaint at ¶ 12]. The Design is intended for use on solar farm foundations, and plaintiff asserts that it provides for increased guardrail durability and thus has a significant profit potential. [Brief at 1]. Plaintiff notes that, in seeking to realize this potential, he has incurred considerable expense in prosecuting patent applications, and he has negotiated with multiple steel manufacturers to assist him in producing and distributing the Design. One such manufacturer was Attala, which expressed interest in executing a License Agreement with plaintiff. In negotiating the terms for the Agreement, plaintiff sent Atwood a proposed distribution/license agreement which had been drafted in his

negotiations with Steel of West Virginia (SOWV), another potential distributor. [*Id.*] The parties used the SOWV agreement as the starting point for the License Agreement in this case, pursuant to which Attala would manufacture and distribute the Design on plaintiff's behalf.

In his complaint, plaintiff describes the License Agreement negotiations as having been conducted by individuals with a longstanding relationship of trust, which, he claims, led him to place considerable reliance upon verbal representations made by defendants. In describing the early drafts of the Agreement, plaintiff alleges that the parties discussed certain specific changes which, one or both parties believed, needed to be made to the SOWV agreement:

> 13. Russell and Atwood had a longstanding business and personal relationship wherein Russell relied on Atwood's counsel and advice.
> 14. Upon Atwood's receipt of the SOWV Agreement and Defendants' lawyer's review, Atwood contacted Russell with comments and requested changes. Atwood said Defendants' lawyer had reviewed the agreement, and generally, he felt it looked fine. However, Atwood requested permission to make certain changes:
> a. the choice of governing law be changed from West Virginia (where SOWV was based) to Texas (Atwood's legal residence);
> b. reduce the $.015 per pound fee of steel sold to $.01 per pound; and
> c. the upfront $75,000 signing fee be eliminated.
> 15. Atwood further stated that Attala Steel/Atwood and Russell would make a lot of money on the Steel Post Design, as he had several projects lined up that could possibly utilize this approach to steel foundations. Russell agreed to the requested changes.
> 16. Later, an additional change was requested to expand the scope of the licensing territory to include Canada and Mexico. Russell also agreed to this change.
> 17. A clean draft of the agreement was circulated on August 9, 2018. Thereafter, Atwood asked to change the choice of law from Texas to Mississippi. Russell agreed to that change.
> 18. On August 28, 2018, Atwood informed Russell that he further revised the agreement to include Attala Steel as a party. Russell agreed to that change.

[Complaint at 4-5].

Plaintiff alleges that, after these negotiations were completed, a final version was sent to him by Atwood. Plaintiff asserts that, in sending him this final version, defendants specifically

2

represented to him that it only included the changes, quoted above, which had been discussed among the parties. Specifically, plaintiff alleges in his complaint that.

> 19. On August 31, 2018, a final version signed by Atwood on behalf of Attala Steel was sent to Russell.
> 20. Defendants never provided Russell with a "redlined" version of the draft *License Agreement* identifying specifically the changes they made to the SOWV Agreement.
> 21. Defendants never specifically pointed out to Russell, either verbally or in writing, the additional changes they made to the SOWV Agreement beyond those previously acknowledged and agreed to by Russell.
> 22. It was Defendants' representation and Russell's understanding that the above changes were the *only* substantive changes made to the draft SOWV Agreement. In other words, Defendants represented to Russell that the *License Agreement* was materially the same as the SOWV Agreement *except for* the changes that Russell had agreed to prior to signing.
> 23. Russell relied on Defendants' representations as to the material changes made to the SOWV Agreement, all of which were agreed to by Russell. Because of these representations and Russell's longstanding relationship with Atwood, Russell did not have legal counsel review the *License Agreement*. Russell focused his final review on the portions of the *License Agreement* where the changes he discussed with Atwood were made.
> 24. On August 31, 2018, Russell executed the *License Agreement*. (Exhibit 1.) He returned it to Defendants the following day.
> 25. The License Agreement states that it is made "by and between Tom Russell … and, Attala Steel Industries, LLC, and Billy Atwood, President (hereinafter "Attala Steel") …." (Exhibit 1 at p.1.)

[Complaint at 5-6].

Plaintiff maintains that, contrary to these assurances, highly oppressive provisions were inserted into the contract, most notably one which provides for indefinite renewals at five-year intervals, solely at Attala's option. Plaintiff argues that this provision makes the Agreement, for all intents and purposes, a "perpetual license," alleging in his complaint that:[1]

---

[1] Specifically, the renewal provision states that:
> 7.1 Term. The initial term of this Agreement shall commence on the Effective Date hereof and shall continue for sixty (60) consecutive calendar months ("The Initial Term"). Thereafter, the term of the Agreement shall automatically renew on the anniversary date of The Initial Term or any extended period for an additional sixty (60) month period unless, at least ninety (90) days prior to the anniversary date of either The Initial Term or a renewal term, Attala Steel gives notice of termination to Russell.

3

> 26. Despite representations to Russell that the *License Agreement* only contained the changes from the foundational document (the SOWV Agreement) discussed with Atwood, there were *numerous* additional substantive changes to the terms of the *License Agreement*.
> **Additional Changes made by Defendants to the SOWV Agreement**
> 27. Most notably, Defendants modified the term of the *License Agreement* to purport to make it a perpetual license and/or license for the duration of the Steel Post Design patent rights at the option of Defendants.
> 28. The title of the *License Agreement* at the top of the first page does not refer to the document as a perpetual license or a license for the duration of the Steel Post Design patent rights.
> 29. The RECITALS on page 1 of the License Agreement do not state any intent by the parties to create a perpetual license or a license for the duration of the Steel Post Design patent rights.
> 30. At no point during negotiations with Defendants did Russell indicate he desired or intended to provide a perpetual license or a license for the entire duration of the Steel Post Design patent rights.

[Complaint at 6-7].

Having noted the allegations in plaintiff's complaint, this court will make some initial observations regarding his efforts to rescind the contract, or to obtain damages for fraud, based upon defendants' alleged conduct during the negotiations. The starting point for this court's discussion is that, as noted by the Fifth Circuit, it is a "long standing and generally accepted principle of contract law that, absent fraud or mental incompetence, a person who intentionally signs a document is bound by its contents," even when he or she did not read the document. *Donovan v. Mercer*, 747 F.2d 304, 308 n. 4 (5th Cir. 1984). It seems clear to this court that, for the purposes of this case, the key words in the above holding are "absent fraud." In so stating, this court notes that the Mississippi Supreme Court has held that "[i]f a party alleges that his entry into a contract was procured by fraudulent representations, parol evidence may be considered in establishing [that] the contract never came into existence." *Turner v. Terry*, 799 So. 2d 25, 33 (Miss. 2001).

---

[Complaint at ¶ 32].

4

In its brief, Attala argues that plaintiff "contends that he was defrauded because defendants did not specifically point out each revision they proposed and did not provide him with a 'redlined' version. This is absurd on its face." [Brief at 6]. This court tends to agree with Attala that these particular allegations, by themselves, would not support a fraud claim, but its argument ignores the fact that the complaint further alleges that:

> 22. It was Defendants' representation and Russell's understanding that the above changes were the *only* substantive changes made to the draft SOWV Agreement. In other words, Defendants represented to Russell that the *License Agreement* was materially the same as the SOWV Agreement *except for* the changes that Russell had agreed to prior to signing.

*Id.* Without question, alleging that defendants made a specific representation that the "above changes were the only substantive changes made to the draft SOWV Agreement" goes a great deal further towards establishing a fraud claim than merely alleging that defendants failed to point out changes in the contract. That being the case, if defendant wishes to see the fraud claims against it dismissed, then it should confront the full allegations of the complaint, and not merely a selective sampling.

In its brief, Attala argues that an integration clause in the contract precludes plaintiff's fraud claims, but, in response, plaintiff notes that a Mississippi bankruptcy judge held that such a clause did not prevent fraud claims from going forward in one particular case, writing that:

> The Mississippi Supreme Court has explained that integration clauses "signal to the courts that the parties agree that the contract is to be considered completely integrated.... [T]hus the purpose and effect of including a merger clause is to preclude the subsequent introduction of evidence of preliminary negotiations ... in a proceeding in which a court interprets the document." *B.C. Rogers Poultry, Inc. v. Wedgeworth,* 911 So.2d 483, 490 (Miss.2005) (citation omitted). Here, Legal Helpers relies upon the integration clause to trigger the parol evidence rule, which precludes the enforcement of inconsistent or prior agreements. *Id* . The Supreme Court, however, has noted that the parol evidence rule "is subject to many exceptions and is said to be very flexible ." *Turner v. Terry,* 799 So.2d 25, 33 (Miss.2001). One of those exceptions applies whenever there are allegations that "the making of a written contract was procured by fraudulent representations." *Id.* at 33–34. Accordingly, the Trustee is not precluded by the parol evidence rule from relying upon pre-contract promises that Legal Helpers made to Huffman in support of his claim

5

of fraud in the inducement. For this reason, the Court finds that the Trustee has alleged sufficient facts supporting a plausible fraud claim against Legal Helpers.

*In re Huffman*, 2013 WL 2481529, at *12 (Bankr. S.D. Miss. June 10, 2013).

In its reply brief, defendant argues that *Huffman* contains important factual differences from this case, and that is certainly true. Indeed, it strikes this court that neither side is able to offer Mississippi authority as closely on point as it would ideally prefer in deciding the difficult issues in this case, and it may end up having to rely upon its own best *Erie*-guess as to how the Mississippi Supreme Court would decide these issues. This court is not prepared to definitively resolve this issue now, but it notes that under Mississippi law applicable to this case, fraudulent misrepresentation consists of the following nine elements: "(1) a representation, (2) its falsity, (3) its materiality, (4) the speaker's knowledge of its falsity or ignorance of its truth, (5) his intent that it should be acted on by the hearer and in the manner reasonably contemplated, (6) the hearer's ignorance of its falsity, (7) his reliance on its truth, (8) his right to rely thereon, and (9) his consequent and proximate injury." *Franklin v. Lovitt Equip. Co.,* 420 So.2d 1370, 1373 (Miss.1982).

In the court's view, the eighth fraud element presents a particularly difficult obstacle for plaintiff in this case, since it seems quite problematic for courts to hold that contracting parties have a "right" to rely upon verbal representations *about what is in the contract* when they can, and should, discover that for themselves by simply reading it.[2] In the court's view, it would be of questionable public policy to essentially absolve contracting parties of their duty to read a contract by holding that they have a right to rely upon alleged verbal representations regarding

---

[2] In so stating, this court believes that incentives already exist which tend to discourage the sort of behavior alleged in the complaint. Specifically, a contracting party who tries to "slip in" contractual provisions which were not discussed among the parties runs the risk that this will be discovered and lead the other side to (correctly) conclude that it is not dealing with a trustworthy partner.

6

what is in it. In so stating, this court notes that the alleged fraudulent misrepresentations in *Huffman* related to matters which were not set forth in the contract, *Huffman*, 2013 WL 2481529 at *12 and, that being the case, the plaintiff could not have discovered the truth simply by reading that contract.

In light of this court's concerns in this regard, it is reluctant to grant plaintiff relief in this case based solely upon how, he alleges, the License Agreement was negotiated. This court notes, however, that in addition to the alleged misrepresentations during negotiations, plaintiff is able to rely upon very extensive authority holding that perpetual or indefinite contracts are disfavored under the law. The Fifth Circuit has held, for example, that "this circuit ... does not favor perpetual contracts" and "presumes that [any such] contract is terminable at will." *Trient Partners I Ltd. v. Blockbuster Ent. Corp.,* 83 F.3d 704, 708 (5th Cir. 1996), citing *Delta Serv. & Equip., Inc. v. Ryko Mfg. Co*., 908 F.2d 7, 9 (5th Cir. 1990). The Mississippi Supreme Court has long followed a similar rule, making clear that "[p]erpetual contracts of this character will not be tolerated by the law, or rather, will not be enforced as imposing an eternal and never-ending burden." *Rape v. Mobile & O.R. Co*., 136 Miss. 38, 100 So. 585, 587 (1924). In arguing that the renewal provision in this case is tantamount to a perpetual contract, plaintiff is able to offer substantial persuasive authority as well. *See, e.g. Armstrong Business Services, Inc. v. H & R Block*, 96 S.W.3d 867, 877 (Mo. App. 2002) ("The practical effect of the duration provision in the franchise agreements is the creation of a perpetual contract. … In the absence of a clear and compelling declaration of the parties' intent to create perpetual franchise agreements, the agreements will not be recognized as such.").

In the court's view, the combined effect of plaintiff's arguments regarding the dishonest manner in which, he claims, the License Agreement was negotiated, and the substantively oppressive nature of what appears to be, for all intents and purposes, a perpetual contract, renders

7

his arguments stronger than if he merely relied upon one or the other. This court emphasizes that it will become even more willing to grant plaintiff relief in this case if he can additionally demonstrate that Attala has been performing its duties under the contract in a bad faith manner. Based upon the briefing presently before this court, it strikes this court as quite possible that plaintiff will be able to make such a showing.

From reading the parties' briefing, this court has two primary suspicions and concerns, as it relates to the manner in which Attala has been performing its duties under the License Agreement. The first suspicion is that defendant has not been timely providing plaintiff with his proper share of the revenue arising from the License Agreement. These concerns arise from plaintiff's allegation that:

> Defendants have repeatedly ignored their obligations to timely pay Russell all amounts due as provided for in the License. License fees owed to Russell have been paid months or even years later than what is provided for in the License with no interest or late fees required. (Compl. ¶112-124 and Dkt. #1-3.) In other words, there is no disincentive for late or non-payment of license fees pursuant to the terms of the License. Further, Attala refuses to provide evidence that it has paid all license fees owed or is complying with the License's sublicensing obligations despite evidence that it is in breach of the same. While Attala asserts that Russell has not been deprived of the License's benefits since he has been paid some fees sporadically, Russell has no access to information necessary to verify compliance with the license fees requirements (either as to amount or timely payment). He is required to simply "trust" Attala even in the face of repeated breaches.

[Brief at 19].

This court's concerns on this issue are not assuaged by a July 22, 2022 letter from counsel for defendant Atwood, attached to the complaint, in which he wrote to counsel for plaintiff that:

> At Mr. Russell's request in February 2022, Mr. Atwood did request ASI's current management to review its sales records for any unpaid license fees that could be considered due under the Agreement. Mr. Atwood explained to Mr. Russell that prior to the sale ASI's longtime CFO, Bobby Matthews, had retired and a new CFO had taken his place so that it may have been possible for a transaction to slip through the cracks during the transition. ASI located some transactions that predated the closing of the sale that

8

> could possibly be considered covered by the Agreement and Mr. Atwood remitted two related payments to Mr. Russell from his personal funds, since the transactions in question pre-dated the closing of the sale of ASI on December 31, 2020. Those payments were made by check 8224 dated February 3, 2022, for $6,000 and check 8235 dated February 15, 2022, for $6,368.84.

[Exhibit 3 to Complaint]. In the court's view, admissions by counsel for Atwood that certain payments may have "slip[ped] through the cracks" and that other payments were made only after plaintiff had raised complaints about them tend to provide some basis for his suspicions that he has been shortchanged by defendant.

Payment issues aside, this court has concerns that, after obtaining what it claims to be permanent rights to the Design, defendant has not made reasonable efforts to market it. These concerns arise from plaintiff's allegations that:

> Attala Steel has no minimum sales obligations under the License. In 2018, 2020, and 2021, no payments were made to Russell pursuant to the License. (Dkt. # 1-4.) Attala Steel CEO, Kevin Heskett, told Russell in January 2022 that Attala Steel had no interest in Russell's Steel Post Design and that . . . he had ordered all high grade steel used for the Steel Post Design to be scrapped. However, Russell may not enter into any other licenses agreements in North America except as provided for by the License. (Compl. ¶¶ 53, 121.)

[Brief at 22].

As noted previously, plaintiff alleges in his complaint that "Atwood further stated that Attala Steel/Atwood and Russell would make a lot of money on the Steel Post Design, as he had several projects lined up that could possibly utilize this approach to steel foundations." [*Id.*] However, plaintiff has attached to his complaint an August 15, 2022 letter to his attorney from counsel for Attala, in which it was represented that no "payments" at all were made in three of the five years in which the Agreement has been in effect:[3]

---

[3] This court notes that the reference to "payments" in this letter evidently refer to licensing fees, since plaintiff writes in this brief that "no license fees [were] paid in calendar years 2018, 2020, or 2021." [Brief at 4].

9

> [I]n your letter you request a full accounting of all payments that have been made to date and other agreements concerning sublicenses or prospective sublicenses. I will note that under the Agreement there are not any provisions of the Agreement that provide for an accounting of payments or representations regarding sublicenses.
> That being said, in the interest of partnership and not any present or future legal obligation by ASI, ASI provides the following:
> Payments in 2018 : $0.00
> Payments in 2019 : $105,322.91
> Payments in 2020 : $0.00
> Payments in 2021 : $0.00
> Payments in 2022 : $47,972.69 (to be issued (via check) on August 17, 2022

[Exhibit 4 to Complaint at 2]. Plaintiff clearly believes that these figures are evidence of half-hearted sales efforts by Attala, and he further alleges that he has been unable to independently verify the amounts provided by defendant. Specifically, plaintiff writes in his complaint that:

> Russell has diligently inquired as to the activities of Defendants regarding the License Agreement since it was executed in 2018. However, Russell has no ability to determine whether Defendants have made accurate calculations as to license fees owed and cannot through the exercise of reasonable diligence discover whether there are other transactions for which payment to Russell is owed but has not been paid. Moreover, Russell has no ability to determine whether any sublicenses have been granted by Defendants under the License Agreement.

[Paragraph 150 of Complaint].

Needless to say, this court has no way of knowing whether plaintiff's suspicions are true that defendant has been shortchanging him and/or refusing to make reasonable efforts to market the Design, and it does not prejudge this issue. This court is inclined to take plaintiff's allegations very seriously, however, partly because it can discern no reason why he would have incurred the great expense of prosecuting this lawsuit if he did not have genuine and serious concerns that he is being treated unfairly by Attala. In so stating, this court notes that plaintiff knows much better than this court what the economic potential of his invention is, and the relief in this case which he seems most eager to obtain is to be allowed to part ways with defendant and to try to realize that economic potential on his own or with some other licensee. This court

can discern no reason why plaintiff would be so eager to accomplish these things if he did not have an entirely genuine belief that Attala was either paying him too little based on sales which were made or not making reasonable efforts to make such sales in the first place.

This court's suspicions regarding Attala's actions in this case are also informed by its belief that the type of company which would slip oppressive contractual terms into a contract, in the manner in which the complaint alleges, is the same type of company which would apply the contract in an unfair manner. In so stating, this court is well aware that plaintiff's allegations are, at this point, just that, but it is required to give them credence at this stage of the proceedings. If plaintiff is able to offer factual support for these allegations at trial, then this court believes that he will be in a strong position to argue that it would be unconscionable to permanently tie him to a company which has behaved itself in the manner alleged in the complaint. In so stating, this court notes that the permanent renewal provision in this contract is already on shaky legal ground, based both on the disfavored status of such provisions and on the very suspect manner in which the contract in this case is alleged to have been negotiated. That being the case, if it can additionally be shown that Attala is applying the contract in an unreasonable manner, then this court believes that it would likely be unconscionable to tie plaintiff to such a relationship for the rest of his life.

This court further believes that proof of such matters as missed payments may enable plaintiff to maintain fraud claims which, for the reasons discussed previously, he may be unable to assert based solely on the alleged nature of the contract negotiations in this case. In so stating, this court emphasizes that while it regards the alleged misrepresentations during negotiations as likely being insufficient, by themselves, to rescind the License Agreement or to establish a fraud claim, that does not mean that such conduct is irrelevant in this case. To the contrary, if jurors

11

believe plaintiff's testimony regarding defendants' misrepresentations during negotiations, then they might reasonably conclude that proof of such things as missed payments is not evidence of matters "slipping between the cracks," but, rather, of a knowing fraud.

This court notes at this point that the allegations of this lawsuit, and the relief sought in it, are of such a nature that it is best regarded as a hybrid bench and jury matter. Indeed, certain relief sought by plaintiff, such as declaring the Agreement unconscionable, are properly for this court to decide, while others, such as plaintiff's misrepresentation claims, are jury matters. For its part, this court is not prepared to rule upon the merits of this case until it conducts a hearing in which representatives from the principal parties are given an opportunity to testify regarding their sides of the story. In so stating, this court notes that, while written briefing may be helpful in a case of this nature, it is no substitute for being able to look the parties in the eye and evaluate the credibility of their testimony at an evidentiary hearing.

The docket indicates that a jury trial is scheduled in this matter for February 5, 2024, and this court believes that this trial could effectively serve a dual purpose of allowing jurors and this court to consider facts and other issues which are properly assigned to them or it. This court further notes that, while negligent and/or fraudulent misrepresentation (as well as breach of contract) damages claims certainly appear to be on the table based on the allegations of the complaint, defendants have raised statute of limitations defenses to these claims. However, plaintiff has responded to these defenses with an argument that a discovery rule applies in this context, and this court may well elect to have jurors make fact findings regarding issues relevant to both misrepresentation and statute of limitations issues.

This court is aware that the parties (particularly plaintiff) have limited resources, and it accordingly advises them that, with one potential exception, it does not intend to grant either side

12

relief in this case until discovery has been conducted and it has considered testimony at trial. That potential exception is the granting of an equitable accounting to plaintiff, if the discovery tools available to him should prove inadequate to learn exactly how defendants have been conducting themselves with regard to crucial matters such as payment and marketing efforts under the License Agreement. This court believes that reliable information in this regard is crucial to resolving this case, since, when deciding whether the Agreement is unconscionable or not, the proof of the pudding is, at least to a large extent, in the eating. In so stating, this court notes that the Agreement is simply silent on a number of important issues such as minimum sales requirements, but that does not mean that it is irrelevant, for unconscionability purposes, whether defendant has been acting in a good faith manner regarding issues which are not specifically addressed in the contract.

     Given the disfavored status of perpetual contracts under the law, it would arguably be bad enough to tie plaintiff to life to even a company which has proven itself to be a trustworthy Licensee acting in good faith. Clearly, however, plaintiff's arguments will become that much stronger if he is able to demonstrate at trial that defendants have either been acting in bad faith or that they have failed to make reasonable efforts to market his Design. Making a showing in this regard requires actual proof, however, and not simply allegations in a complaint.

     This court accordingly believes that a robust discovery process is essential in this case, but, if that process should prove inadequate to provide clarity regarding how defendants have been conducting themselves under the Agreement, then the awarding of an equitable accounting would seem to be a reasonable option. This court is certainly open to ordering such an accounting itself, and it believes that Magistrate Judge Virden, who has greater expertise in discovery matters than this court, may be even better suited to determine (either directly or in a

report and recommendation) whether such an order would be appropriate. It should be noted that, in response to Atwood's motion to dismiss the claims against him in his personal capacity, plaintiff responded by voluntarily dismissing all of his claims against this defendant except for Count II, which seeks an equitable accounting. [Docket entry 26] It is thus plain that Atwood no longer faces a potential monetary judgment in this case, but it does seem plausible that he might prove to have certain information at his disposal, as to which the award of an equitable accounting would be in order. This court will therefore leave Atwood in this lawsuit, to this limited extent.

As a final note, this court observes that, while the trial in this matter is presently set for trial over a year from now, it frankly believes that this case could, and should, be resolved with a settlement much sooner than that. In so stating, this court notes that, if Attala's cited figures regarding the amounts of payments it has received from the Design in this case are accurate, then it seems doubtful that these amounts would justify the expense and risk it faces in this lawsuit. It further seems unclear why defendant would wish to incur this expense in order to maintain a business relationship which has become so toxic. Once again, the relief which plaintiff seems most eager to obtain is to be released from his relationship with defendants, and it strikes this court that it would be in the interests of both sides for this to occur, as part of the settlement of this lawsuit.

In light of the foregoing, it is ordered that defendants' motions to dismiss are denied.

This, the 13th day of January, 2023.

/s/ Michael P. Mills
UNITED STATES DISTRICT JUDGE
NORTHERN DISTRICT OF MISSISSIPPI